**In re Eugene T. & Doris J. MERRIAM, Debtors.**

**Eugene T. Merriam and Doris J. Merriam, Plaintiffs,**

v.

**Chase Manhattan Mortgage Corporation, Defendant.**

**Bankruptcy No. 02–10268B. Adversary No. 02–1111B.**

United States Bankruptcy Court, W.D. New York.

Nov. 9, 2005.

Southern Tier Legal Services, Mark H. Wattenberg, of counsel, Bath, NY, for Plaintiffs.

Phillips Lytle LLP, John T. Sullivan, Jr., of counsel, Chad W. Flansburg, of counsel, Rochester, NY, for Defendant.

### AMENDED DECISION & ORDER

CARL L. BUCKI, Bankruptcy Judge.

In this adversary proceeding, the debtors seek to rescind two mortgages pursuant to the authority of the Truth in Lending Act,[1] as amended by the Home Ownership and Equity Protection Act

---

1. Pub.L. 90–321, Title I, May 29, 1968, 82 Stat. 146 (now codified in 15 U.S.C. §§ 1601– 1613, 1631–1646, 1666–1667e, 1671–1677).

("HOEPA").[2] As presented by stipulation to the court, the central dispute is whether the debtors' secured line of credit qualifies as the type of loan that is subject to the disclosure requirements of 15 U.S.C. § 1639(a). In deciding this issue, the court must address two primary questions. First, did the lender reasonably contemplate that the debtors would engage in repeat transactions, so that their line of credit might satisfy an exemption allowed for an open end credit plan? If instead the transaction involves closed end credit, then the court must consider the second question, namely whether the lender imposed charges that cause the line of credit to qualify as a high cost loan for purposes of 15 U.S.C. § 1602(aa)(1)(B).

On November 12, 1963, Eugene and Doris Merriam acquired their home at 62 O'Connor Street in Wellsville, New York. They occupied the property together until Doris's death on November 13, 2002. Eugene continues to reside on these premises at the present time. Unfortunately, by the autumn of 1999, Mr. and Mrs. Merriam had accumulated significant credit card debt. Rather than seek relief under chapter 7 of the Bankruptcy Code, the Merriams approached Advanta National Bank for a line of credit that they might use to satisfy their outstanding obligations.

At the time that they applied for a line of credit, Mr. and Mrs. Merriam were both septuagenarians having a limited income. As their only significant asset, the house at 62 O'Connor Street had an appraised value of $33,000. However, the property was already subject to a first mortgage that the Merriams had given to Community Bank, N.A., in 1995, to secure a note in the original amount of $28,000. Nonetheless, Advanta National Bank agreed to extend two loans, each of which was contingent on the closing of the other. Mr. and Mrs. Merriam executed both sets of loan documents on February 14, 2000.

Advanta extended its first loan for the principal sum of $29,450, to be secured by a first mortgage on the O'Connor Street property. The Merriams essentially used this loan to refinance a pre-existing first mortgage held by Community Bank. Standing alone, the first Advanta loan would have lacked financial justification. The debtors applied all but $181.31 of its proceeds either to discharge the remaining balance owed to Community Bank in the amount of $25,594.67, or to pay closing costs and fees. The Community Bank loan had required repayment with interest at the rate of 9%, through monthly payments of $251.92 over a term of years that would end on July 1, 2015. In contrast, the Advanta loan required payment of interest at the rate of 10%, with monthly payments of $284.20, for a term that would end on February 20, 2020. Essentially, therefore, Advanta's first loan contemplated a higher rate of interest and larger payments over a greater number of months, all without any meaningful advance of new money to the Merriams.

For the Merriams, the only reason to execute the first Advanta loan was the opportunity to obtain the second Advanta loan. Pursuant to this second loan, Mr. and Mrs. Merriam obtained a line of credit that would allow them to borrow a stated principal of up to $13,800 at a variable rate of interest that could range between 14% and 22%. Under the note, the Merriams were to pay only interest for three years, after which the loan would amortize over twenty years. During the first three years only, the loan would serve as a line

---

2. Pub.L. 103–325, Title I, Subtitle B, September 23, 1994, 108 Stat. 2190 (now codified in 15 U.S.C. §§ 1601, 1602, 1604, 1610, 1639, 1640, 1647, 1648).

of credit, which the borrowers could pay down and then use again to obtain new advances for a total borrowing that was not to exceed $13,800. In actuality, the Merriams depleted the entire line of credit at the time of closing, for the purpose of paying the outstanding balances on various credit cards. Thereafter, they were never able to pay any of the outstanding principal, and accordingly never used that facility as a line of credit.

On March 10, 2000, less than one month after the Merriams executed their loan documents, Advanta National Bank sold both of the obligations to Chase Manhattan Mortgage Corporation ("Chase"), the defendant herein. Meanwhile, Mr. and Mrs. Merriam soon encountered the same cash flow problems that they had intended to alleviate when they incurred the Advanta loans. In theory, the Advanta loans were designed to allow the Merriams to discharge credit card debt with high interest rates, and to replace that debt with a secured obligation having a somewhat lower rate of interest. Indeed, the transactions effected a reduction in the total of minimum monthly payments. Nonetheless, the loans failed to solve a more fundamental problem, namely that the Merriams lacked sufficient income both to pay their normal expenses and to service their debt even as it was restructured. As a consequence, they filed a petition for relief under chapter 7 of the Bankruptcy Code on January 15, 2002.

On May 15, 2002, counsel for the debtors sent to Chase a letter stating that Mr. and Mrs. Merriam had elected to rescind their loans. One day later, the Merriams commenced the present adversary proceeding to enforce those rights of rescission.[3] Soon thereafter, the Merriams filed an amended complaint, which Chase an-

swered on September 13, 2002. Then, on September 30, 2003, the debtors moved for summary judgment with respect to three of their five causes of action. Prior to a hearing on that motion, however, the parties reported to the court that although they were able to stipulate as to most of the relevant events, they continued to dispute several key facts. In light of this acknowledgment that the case was not ripe for summary judgment, the court set the matter for trial as to liability only with respect to the three causes of action for which the debtors have sought summary relief. Prior to that trial, the parties agreed by stipulation to limit their argument and proof to a narrow basis for relief. Accordingly, for purposes of the present opinion and without precluding future argument on other issues, I will focus my discussion on the issues that the parties have presented.

At the trial of this case, the court considered only the first, second, and fifth causes of action. The first and second causes of action seek, respectively, to rescind the outstanding first mortgage loan and the line of credit. The fifth cause of action requests statutory damages of $2,000, by reason of the lender's failure to meet the prior demand for cancellation of the loans and a refund of the finance charges. As presented to the court, however, the first and fifth causes of action really depend upon the outcome of the second cause of action. Under the fifth cause of action, any right to damages derives from the failure to rescind as alleged under the first and second causes of action. With respect to the first cause of action, the debtors' counsel now argues that the agreements require a rescission of the first mortgage in the event of a rescission of the credit line mortgage. Thus, at this time,

---

**3.** Although Mrs. Merriam is now deceased, she remains listed as a plaintiff in this pro-

ceeding. Thus, this opinion will address the rights of both Eugene and Doris Merriam.

the plaintiffs' claim depends upon the application of the Truth in Lending Act and HOEPA to the second cause of action and its demand to rescind the line of credit loan.

As codified in 15 U.S.C. § 1635, the Truth in Lending Act establishes a right of rescission as to certain loan transactions. In relevant part, subdivision (a) of this section states this general rule:

> Except as otherwise provided in this section, in the case of any consumer credit transaction . . . in which a security interest . . . is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section *together with a statement containing the material disclosures required under this subchapter, whichever is later.*

(emphasis added). In the present instance, the Merriams contend that although they received the required rescission forms, Advanta failed to provide various of the "material disclosures". Pursuant to 15 U.S.C. § 1602(u), "materi-al disclosures" are defined to include "the disclosures required by section 1639(a)." These are the disclosures that the Merriams claim to be lacking. If this contention is correct, then the right to rescind continues until the latter of three days after those material disclosures are provided or until three years after consummation of the transaction. 15 U.S.C. § 1635(a) and (f). Here, the Merriams gave their notice to rescind on May 15, 2002, a date within three years of the closing in February of 2000.

Chase concedes that Advanta may have failed to make some of the disclosures that section 1639(a) would require.[4] Rather, Chase argues that these disclosure requirements do not apply to the credit line transaction.

By its own terms, section 1639(a) applies to "each mortgage referred to in section 1602(aa)" of Title 15. For purposes of the present dispute, it is not necessary to discuss all of the complex provisions of section 1602(aa). Rather, the parties have identified two controlling questions. First, does the credit line mortgage qualify for the exception that section 1602(aa) recognizes for "a transaction under an open end credit plan"? 15 U.S.C. § 1602(aa)(1). Second, if the credit line mortgage is not an open end credit plan, then does the

---

4. Section 1639(a) reads as follows:

(1) Specific disclosures

In addition to other disclosures required under this subchapter, for each mortgage referred to in section 1602(aa) of this title, the creditor shall provide the following disclosures in conspicuous type size:

(A) "You are not required to complete this agreement merely because you received these disclosures or have signed a loan application.".

(B) "If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan.".

(2) Annual percentage rate

In addition to the disclosures required under paragraph (1), the creditor shall disclose—(A) in the case of a credit transaction with a fixed rate of interest, the annual percentage rate and the amount of the regular monthly payment; or (B) in the case of any other credit transaction, the annual percentage rate of the loan, the amount of the regular monthly payment, a statement that the interest rate and monthly payment may increase, and the amount of the maximum monthly payment, based on the maximum interest rate allowed pursuant to section 3806 of Title 12.

transaction satisfy the threshold requirements for a high fee or high interest loan? 15 U.S.C. § 1602(aa)(1).

### Status as Open-end Credit Plan

■ Section 1602(aa)(1) of Title 15 states that a mortgage referred to in that subdivision "means a consumer credit transaction that is secured by the consumer's principal dwelling, other than ... a transaction under an open end credit plan ...." In relevant part, 15 U.S.C. § 1602(i) states that "[t]he term 'open end credit plan' means a plan *under which the creditor reasonably contemplates repeated transactions,* which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." (emphasis added). Chase contends that the structure of the credit line mortgage satisfies this definition, by reason of its form as a credit line mortgage. The debtors respond that their circumstances belied any reasonable possibility of repeated transactions, and that therefore, the loan cannot satisfy the exception allowed for open end credit.

In the present instance, the credit line allowed the borrowers to take advances only during an initial period of three years. Thereafter, the outstanding balance would be amortized over twenty years. On the day of closing, however, Advanta disbursed the entire line of credit. Because the loan permitted the Merriams to pay only interest during the first three years, the schedule of required payments contemplated no such reduction of principal as would allow a further loan advance. Although the Merriams could theoretically have paid some or all of the principal balance during the first three years of the loan, the facts demonstrate virtually no possibility of such an event. Their income derived solely from social security and a part time job that Mr. Merriam maintained. As of the date of loan closing, this income totaled only $1,564.50 per month. Meanwhile, Advanta itself had calculated that the debtors needed $1,027.89 per month for fixed housing expenses and for amounts due on installment obligations, including those that would be owed to Advanta. Thus, Eugene and Doris Merriam would have less than $550 to meet all of their other monthly expenses, including food, clothing, utilities, uninsured medical expenses, and transportation costs other than the remaining installment payments due on their automobile.

Chase has stipulated that at the time of closing, employees of Advanta knew the financial information that is recited above. At trial, Mr. Merriam testified that even after the closing of the Advanta loans, he and his wife lacked sufficient income both to make minimum payments on their debts and to satisfy basic needs. Based upon the totality of the evidence presented, this court finds that Mr. and Mrs. Merriam realistically had no ability to make any payments on account of the principal that Advanta had advanced on the line of credit, and that they had provided Advanta with sufficient information to cause Advanta to reach this same conclusion. With this knowledge, Advanta could not realistically have anticipated any reduction of principal during the time that only interest was due. Because Advanta had fully disbursed the entire loan at closing, it could not possibly have contemplated repeat transactions on the line of credit. Accordingly, that loan fails to satisfy the definition of an open end credit plan, and cannot qualify for any exemption from the category of mortgages to which section 1602(aa) of Title 15 refers.

### Status as High Interest Loan

■ The second disputed issue is whether the credit line mortgage satisfies the threshold requirements for a high fee

or high interest loan. Pursuant to 15 U.S.C. § 1602(aa), a closed end mortgage may be subject to the HOEPA requirements of 15 U.S.C. § 1639(a), if it satisfies one of several alternative thresholds. The Merriams assert that the credit line mortgage fulfills the particular threshold in section 1602(aa)(1)(B), which provides that the HOEPA requirements would here apply if "the total points and fees payable by the consumer at or before closing will exceed the greater of—(i) 8 percent of the total loan amount; or (ii) $400."

In the present instance, the Merriams entered two loan transactions. In the first transaction, they borrowed $29,450. After disbursing $25,594.67 to satisfy the balance due on a prior mortgage, Advanta paid loan fees of $2,386.50 and other settlement charges of $1,288.52. Thus, on paper, this loan produced net proceeds of only $180.31. In the second transaction, Advanta purported to give to the Merriams a line of credit for $13,800. As reported on Form HUD–1, this loan required payment of settlement charges totaling $1,234.50. Chase Manhattan Mortgage Corporation contends, however, that of these settlement charges, only $790 represents points and fees payable by the consumer at or before the closing. Noting that this sum equals 6.9 percent of the borrowing on the credit line, Chase asserts that the second loan fails to satisfy the threshold for application of HOEPA.

The Merriams do not now challenge the adequacy of disclosure with respect to the refinancing mortgage. They contend, however, that the line of credit mortgage cannot be viewed on a "stand alone" basis. Because the refinancing mortgage provided no material benefit other than the opportunity to obtain the credit line mortgage, the Merriams argue that the points and fees charged with respect to the refinancing mortgage should be treated as if

charged to the credit line mortgage, so that the effective charges would be deemed to exceed the 8% threshold.

This court can find no legal basis for the plaintiffs' argument that points and fees paid on one loan should be treated as points and fees on a different loan. Although the Merriams received no independent benefit from the refinance loan, they nonetheless agreed to enter two separate loan transactions. Advanta disbursed funds to discharge the prior mortgage, and it independently disbursed funds under the line of credit. The Merriams executed two distinct sets of loan documents. They signed an agreement that required the payment of points and fees with respect to one loan, and they separately signed another agreement that required the payment of a different amount of points and fees with respect to a second loan. While the second loan may have been contingent on acceptance of the first loan, the parties nonetheless agreed to create two loans, not one. Such was their agreement, and this court lacks authority to impose a new or different structure to the transactions. Chase has acknowledged points and fees totaling $2,386.50 with respect to the refinancing mortgage, and points and fees totaling $790 with respect to the line of credit. Standing alone, each sum represents less than 8% of the loan amount to which it relates.

The 8% threshold of section 1602(aa)(1)(B) is calculated through the process of simple division, in which the numerator represents the total of fees and points while the denominator represents the total loan amount. Even if the court would accept the plaintiffs' argument that the numerator should include the fees and points from both loans, such an adjustment would necessarily require that the denominator be increased to include the amount of both loans. When so combined, the fees

and points total $3,176.50, while the total loan amount would be $40,073.50 (i.e., the principal of the refinance loan plus the principal of the credit line, less the prepaid fees and points). Based upon these numbers, the total fees and points represents only 7.9266847 percent of the combined loan amounts. Thus, the plaintiffs would fail to meet the threshold in any event.

Finally, the Merriams contend that points and fees should include various expenses that were charged to the borrowers, and that those expenses cause the total of points and fees to exceed the 8% threshold of 15 U.S.C. § 1602(aa)(1)(B). Pursuant to 15 U.S.C. § 1602(aa)(4)(C), points and fees shall include "each of the charges listed in section 1605(e) of this title (except an escrow for future payment of taxes), unless—(i) the charge is reasonable; (ii) the creditor receives no direct or indirect compensation; and (iii) the charge is paid to a third party unaffiliated with the creditor." The charges listed in section 1605(e) include fees or premiums for title insurance and fees for preparation of loan-related documents. In the present instance, with respect to each of the two loans, Advanta charged identical sums of $276 for title insurance and identical sums of $25 for an EPA endorsement. The plaintiffs argue that this repetition demonstrates a duplication of fees, and that such duplication renders the charges unreasonable. To the contrary, this court believes that this repetition merely creates an issue of fact. Is the title insurance fee a duplication, or does it reflect the separate but similar cost of providing insurance with respect to each of the separate mortgages? Is the EPA endorsement charge a duplication, or does it represent an allocation of half of the total fee to each of the two loans? Having failed to provide sufficient proof of the duplicative nature of these charges, the plaintiffs have failed to meet

their burden to show that the total of fees and points include fees sufficient to satisfy the threshold requirements for the application of HOEPA.

## Conclusion

As the assignee of the line of credit loan, Chase is subject to all claims and defenses that the Merriams might assert under HOEPA. 15 U.S.C. § 1641(d). Although the line of credit does not qualify as an open end loan that is exempt from HOEPA, the plaintiffs have failed to establish that the admitted points and fees represent 8% of the loan amount. Thus, the debtors are unable to satisfy this threshold requirement for application of the statute. Accordingly, this court must deny the plaintiffs' request for judgment with respect to its second cause of action to rescind the line of credit. Because relief on the first and fifth causes of action is predicated upon a favorable decision on the second cause of action, this court must also deny the balance of the relief that the plaintiffs have requested at this time.

This decision resolves only the issues that the parties have agreed by stipulation to present to the court for its present consideration. Thus, I do not now decide whether Advanta may have violated other provisions of the Truth in Lending Act. For example, I noted that with respect to the credit line mortgage, Advanta did not provide the disclosures for a closed end transaction. However, the plaintiffs did not argue this point at trial, and the defendant has not had an opportunity to argue the consequences of such a violation. By its terms, the stipulation of the parties has served only to define issues for a hearing on a request for partial judgment. Accordingly, by separate order, this court will schedule a further pretrial conference for the purpose of establishing a frame-

work for resolving the balance of the dispute among the parties.

So ordered.